**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | | |
|---|---|---|
| MARTINDALE CORPORATION, | | |
| Plaintiff, | | No. 08-CV-2065-LRR |
| vs. | | |
| HEARTLAND INNS OF AMERICA, L.L.C., | | **ORDER** |
| Defendant, | | |
| vs. | | |
| MARTINDALE IOWA, LLC, | | |
| Counterclaim Defendant. | | |

_____

## *TABLE OF CONTENTS*

**I.    INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

**II.   RELEVANT PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . **3**

**III.  SUBJECT MATTER JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . **4**

**IV.   STANDARD OF REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

**V.    RELEVANT FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . **5**
    **A.    Parties** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
    **B.    Agreement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
        **1.    Due diligence** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
        **2.    Deposit** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
        **3.    "As Is"** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
        **4.    Risk of loss** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
        **5.    Closing** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
        **6.    Default** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
        **7.    Choice of law** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
        **8.    Entire agreement** . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
        **9.    Waiver** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

  C.  *The Great Flood of 2008* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
  D.  *Change Orders* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
  E.  *Post-Flood Dealings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
  F.  *The Amendment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**
  G.  *Parties Dispute Pre-Closing Requirements* . . . . . . . . . . . . . . . . **13**
  H.  *Parties Fail to Close* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**
  I.  *Notice of Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**
  J.  *Heartland Revokes Martindale's Inspection Privileges* . . . . . . . . . **16**

**VI.** **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**
  A.  *Heartland Motion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**
    1.  *Heartland's argument* . . . . . . . . . . . . . . . . . . . . . . . . **17**
    2.  *Martindale's defenses* . . . . . . . . . . . . . . . . . . . . . . . . **17**
      a.  *Coralville Hotel repairs* . . . . . . . . . . . . . . . . . . **18**
      b.  *Estoppel certificates* . . . . . . . . . . . . . . . . . . . . **22**
      c.  *Zoning variance* . . . . . . . . . . . . . . . . . . . . . . . **23**
      d.  *Trademark rights* . . . . . . . . . . . . . . . . . . . . . . **24**
      e.  *Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**
    3.  *Breach of Change Orders* . . . . . . . . . . . . . . . . . . . . . **25**
    4.  *Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**
  B.  *Martindale Motion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**
    1.  **Noerr-Pennington** *immunity* . . . . . . . . . . . . . . . . . . . **27**
      a.  *First Complaint was not "objectively baseless"* . . . . . . **28**
      b.  *Martindale's subjective intent* . . . . . . . . . . . . . . **29**
    2.  *Merits of tortious interference claim* . . . . . . . . . . . . . . . **29**
    3.  *Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**
  C.  *Martindale's Motion to Strike* . . . . . . . . . . . . . . . . . . . . . . . **31**

**VII.** **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

### *I. INTRODUCTION*

The matters before the court are: (1) Defendant Heartland Inns of America, LLC's "Motion for Summary Judgment" ("Heartland Motion") (docket no. 45); (2) Plaintiff Martindale Corporation's "Motion for Partial Summary Judgment Dismissing Heartland's Counterclaim for Tortious Interference with Prospective Business Relations" ("Martindale Motion") (docket no. 46); and (3) Plaintiff Martindale Corporation's "Motion to Strike Certain Exhibits from Heartland's Sur-Reply" ("Motion to Strike") (docket no. 60).

## II. RELEVANT PROCEDURAL BACKGROUND

On October 29, 2008, Plaintiff Martindale Corporation ("Martindale") filed a Complaint ("First Complaint") (docket no. 2) seeking a declaratory judgment that it had a legally enforceable contract to purchase eighteen hotels from Defendant Heartland Inns of America, LLC ("Heartland"). On November 25, 2008, Heartland Filed an Answer (docket no. 8).

On March 31, 2009, Heartland filed an "Amended Answer and Counterclaim" (docket no. 27) in which it substantively denied the allegations in the First Complaint. Heartland also alleged counterclaims against Martindale on various breach of contract theories and a tortious interference with prospective business relationships theory. On May 21, 2009, Heartland filed an "Amended Counterclaim/Third-Party Claim" (docket no. 36) in which it added Martindale Iowa, LLC as a defendant. On the same date, Martindale filed an "Amended Complaint" (docket no. 35) in which Martindale abandoned its quest for a declaratory judgment. Instead, Martindale asserted a claim against Heartland for breach of contract. On June 5, 2009, Martindale filed an Answer (docket no. 39) to the Amended Counterclaim in which it substantively denied the allegations in the Amended Counterclaim. On June 10, 2009, Heartland filed an Answer (docket no. 40) to the Amended Complaint in which it denied the substance of the allegations.

On July 13, 2009, Heartland filed the Heartland Motion. That same date, Martindale filed the Martindale Motion. On August 6, 2009, Heartland filed a Resistance (docket no. 52) to the Martindale Motion, and Martindale filed a Resistance (docket no. 53) to the Heartland Motion. On August 13, 2009, Heartland filed a Reply (docket no. 54) to Martindale's Resistance, and Martindale filed a Reply (docket no. 55) to Heartland's Resistance.

On August 21, 2009, Heartland filed a Motion to Strike (docket no. 56). In its

Motion to Strike, Heartland asked the court to strike a statement of facts that Martindale submitted with its Reply. On August 26, 2009, the court entered an Order (docket no. 57) denying Heartland's Motion to Strike. However, the court permitted Heartland to submit a surreply to the new facts raised by Martindale. On August 31, 2009, Heartland filed its Surreply (docket nos. 58 & 59). On September 3, 2009, Martindale filed the Motion to Strike in which it seeks to exclude certain exhibits Heartland submitted with its Surreply. On September 16, 2009, Heartland filed a Resistance (docket no. 63). On September 23, 2009, Martindale filed a Reply (docket no. 64).

The parties requested oral argument on their Motions. The court finds that oral argument is unnecessary. The Motions are fully submitted and ready for decision.

## III.  SUBJECT MATTER JURISDICTION

The court has diversity jurisdiction over this case because complete diversity exists among the parties and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332. Martindale and Martindale Iowa, LLC are citizens of Delaware. Heartland is a citizen of Iowa. The court is satisfied that subject matter jurisdiction exists.

## IV.  STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "[T]o establish the existence of a genuine issue of material fact, 'a plaintiff may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Commc'ns,*

*Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)). Rather, the nonmoving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'" *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am., Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see, e.g.*, *Baum v. Helget Gas Prods., Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## V. RELEVANT FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to the non-moving parties and affording them all reasonable inferences, the material facts are these:

### A. Parties

Martindale is a Delaware corporation with its principal place of business in New

York, New York. Martindale Iowa, LLC is a Delaware limited liability company created for the purposes of the transaction that forms the basis of the instant action. Heartland is an Iowa limited liability company, with its principal place of business in Iowa. Heartland owns and operates a chain of eighteen hotels located in Iowa and Wisconsin.

## B. Agreement

On May 14, 2008, the parties entered into an "Agreement of Purchase and Sale" ("Agreement"). In the Agreement, Martindale agreed to pay $45 million to purchase the chain of eighteen Heartland Inn hotels located throughout Iowa and Wisconsin. Martindale's offer to purchase the hotels was not contingent on financing. Pursuant to the Agreement, Martindale placed a $500,000 deposit into escrow on May 14, 2008. The balance of the purchase price was due at closing. The parties could not modify, cancel or terminate the Agreement "except in a writing signed by all the parties." Plaintiff's Appendix ("Pl. App'x") (docket nos. 53-5-6), at 35.

### 1. Due diligence

The Agreement provides that Martindale would have a 45 day "Due Diligence Period" to inspect and investigate the hotels. The due diligence section provides:

> 3.1 Due Diligence Period. [Martindale] shall have Forty-Five (45) days from the date this Agreement is signed and delivered by both [Heartland] and [Martindale] . . . within which to undertake such inspections and investigations of the Hotels as [Martindale] deems desirable to evaluate the financial and physical condition of the Hotels and such other matters as [Martindale] may deem relevant. If [Martindale], in its sole discretion, shall determine that the Hotels or any matters related to the Hotels are unsatisfactory for any reason or no reason, then [Martindale] may terminate this Agreement by written notice ("Termination Notice") given to [Heartland] prior to the end of the Due Diligence Period. Time is of the essence with respect to the giving of a Termination Notice. Upon the giving of a Termination Notice prior to the expiration of the Due Diligence Period, this Agreement shall

terminate, Escrow Agent shall return the Deposit to
[Martindale] and neither party to this Agreement shall
thereafter have any further rights or liabilities under this
Agreement other than those that expressly survive termination
of this Agreement.

Pl. App'x at 9-10. The Due Diligence Period was originally set to end on June 28, 2008.

The Agreement provides that if Martindale failed to terminate the Agreement "on
or before the end of the Due Diligence Period, [it] will be deemed to confirm as of such
date that [Martindale] has been given a reasonable opportunity to inspect and investigate
the Hotels . . . ." *Id.* at 11.

### 2. *Deposit*

The Agreement provides that the $500,000 deposit would become non-refundable
if the Due Diligence Period expired and Martindale did not provide a Termination Notice.
The deposit was refundable, however, if the failure to close was due to casualty or
condemnation of more than two hotel properties or Heartland's default under the
Agreement. Section 2.4 states:

> 2.4 <u>Non-Refundable</u>. The Deposit shall become non-
> refundable at the expiration of the Due Diligence Period,
> unless the Closing shall fail to occur by reason of (a)
> [Heartland's] default under this Agreement, (b) [Heartland's]
> inability to close in accordance with the terms of this
> Agreement, or (c) Section 1.3, ARTICLE 11 or ARTICLE 12
> hereof.

*Id.* at 9.

### 3. *"As Is"*

The parties agreed that the hotels were to be sold "As Is." Specifically, Section 4.1
of the Agreement states, in relevant part:

> 4.1 <u>As Is</u>. . . . [Heartland] and [Martindale] agree that,
> except as expressly provided for in this Agreement and the
> Transaction Documents, (i) the Hotels shall be sold and
> [Martindale] shall accept possession of the Hotels on the

Closing Date "AS IS," "WHERE IS," and "WITH ALL FAULTS," and (ii) such sale shall be without representation or warranty of any kind, whether express, implied, statutory or otherwise . . . .

*Id*. at 11.

### 4. *Risk of loss*

The Agreement also contains "Risk of Loss" and "Casualty" provisions. "The risk of loss or damage to the [hotels] by fire or other casualty, until Closing, [was] assumed by [Heartland]." *Id*. at 21. Section 11.1 of the Agreement contains a casualty provision and states, in relevant part:

> 11.1 <u>Casualty</u>. . . . If the Improvements on more than two (2) Hotels comprising the Property shall be materially damaged or destroyed by fire, storm or other casualty before the Closing, [Martindale] shall have the right to terminate the agreement by written notice to [Heartland] within seven (7) business days after receiving notice of such damage or destruction. Upon such termination, [Martindale] shall receive a refund of the Deposit, whereupon the obligations of the parties hereto . . . shall terminate. If [Martindale] does not elect to terminate this Agreement or if said destruction is immaterial, or if said destruction shall occur at, only two (2) or less of the Hotels, this Agreement shall continue in full force and effect without any modification or abatement of the Purchase Price, and [Martindale] shall be entitled to receive an absolute assignment . . . from [Heartland] of any interest [Heartland] may have otherwise had in the proceeds of any insurance on the property . . . except for any actual out-of-pocket expense theretofore incurred by [Heartland] for restoration . . . .

*Id*.

### 5. *Closing*

The Agreement set the closing for sixty days after the expiration of the Due Diligence Period. Closing was originally scheduled to occur on August 27, 2008. At

closing, Martindale was to tender the remaining $44,500,000 of the purchase price.

### 6.   Default

The Agreement provided the parties with different remedies in the event of default.
If Martindale defaulted, Heartland was entitled to keep the $500,000 deposit as liquidated
damages.  Section 16.1 provides:

> 16.1   PURCHASER'S DEFAULT. . . . [IF] THE CLOSING
> SHALL FAIL TO OCCUR SOLELY AS A RESULT OF
> [MARTINDALE'S] DEFAULT HEREUNDER, THEN, AS
> [HEARTLAND'S] SOLE AND EXCLUSIVE REMEDY FOR
> [MARTINDALE'S] FAILURE TO CLOSE, THE ENTIRE
> AMOUNT OF THE DEPOSIT (PLUS ALL INTEREST
> ACCRUED   THEREON,   IF   ANY)   SHALL   BE
> IMMEDIATELY PAID TO [HEARTLAND].

*Id*. at 33.   If Heartland defaulted, Martindale could pursue one of three remedies.
Martindale's remedies are governed by Section 16.2, which provides, in relevant part:

> 16.2   Seller's Default.  If [Heartland], through no fault of
> [Martindale], fails to perform its obligations hereunder and
> Closing does not occur as a result thereof, [Martindale] may,
> as its sole remedy, at its option, either:  (a) terminate this
> Agreement and receive a refund of the Deposit [and its
> reasonable expenses up to $100,000], whereupon the
> obligations of the parties hereto . . . shall terminate; (b) seek
> an action for specific performance under this Agreement; or
> (c) seek any other remedy in law or equity.  In no event
> whatsoever shall [Martindale] be entitled to collect any
> damages from [Heartland].

*Id*. at 34.

### 7.   Choice of law

The Agreement provides that "[it] shall be governed by the laws of the State of
Iowa." Def. App'x at 37.  The parties do not dispute that Iowa law applies.

### 8.   Entire agreement

The Agreement also contains a typical merger and integration clause.  Section 19.1

of the Agreement provides that:

> This Agreement and the exhibits attached hereto embody the entire agreement existing between the parties in connection with this transaction, and there are no oral agreements between the parties relating to this transaction which are not expressly set forth herein. This Agreement may not be modified or, except as expressly provided to the contrary herein, canceled or terminated, except in a writing signed by all parties.

*Id.* at 35.

### 9.    *Waiver*

The Agreement contains a "Waiver" clause. Section 19.2 provides, in part, that:

> Failure of either party to object to any act or omission on the part of the other party, no matter how long the same may continue, shall not be deemed to be a waiver by such party of any of its rights hereunder unless expressly provided to the contrary herein. No waiver by any party at any time, express or implied, of any breach of any provision of this Agreement shall be deemed a waiver of the breach of any other provision of this Agreement or a consent to any subsequent breach of the same or any other provision.

*Id.*

### C.  The Great Flood of 2008

On or about June 13, 2008, the Coralville, Iowa Heartland Inn ("Coralville Hotel") flooded during the Great Flood of 2008. The Coralville Hotel is the largest and most profitable of Heartland's eighteen hotels. Heartland informed Martindale of the flooding shortly after it occurred. The flooding occurred within the 45 day Due Diligence Period. Thus, Martindale was entitled to terminate the Agreement by giving written notice to Heartland. However, Martindale did not terminate the Agreement prior to June 28, 2008.

### D.  Change Orders

On July 28, 2008, approximately thirty days after the Due Diligence Period expired, the parties executed a document entitled "Change Order." The Change Order called for

$106,131 of repairs and upgrades to the Coralville Hotel. On September 12, 2008, the parties executed a document entitled "Change Order #2," which called for an additional $16,470 of upgrades and furniture.[1]

### E. Post-Flood Dealings

Shortly after the flood and before the Due Diligence Period expired, Heartland began to clean up and renovate the Coralville Hotel. On July 9, 2008, Martindale's President, Paul Wallace ("Wallace"), visited Iowa to meet with Heartland's President, Joseph Minard ("Minard"). The purpose of Wallace's visit was to tour the Coralville Hotel and discuss the renovation efforts. Minard asked Wallace whether Martindale wanted Heartland to repair the Coralville Hotel itself or simply assign the insurance proceeds to Martindale so that it could make the repairs.[2] Wallace told Minard that Martindale wanted Heartland to complete the renovations to the Coralville Hotel.

On August 21, 2008, Martindale's counsel, Andrea Duncliffe ("Duncliffe"), notified Heartland that the Dubuque, Iowa Hotel ("Dubuque Hotel"), another hotel subject to the Agreement, encroached over a setback line and that Heartland should obtain a variance. On September 25, 2008, the Dubuque Zoning Board of Adjustment ("Zoning Board") voted to grant the variance.

On August 29, 2008, Duncliffe contacted Heartland's counsel, Robert Braun ("Braun"), and asked that Heartland obtain estoppel certificates[3] from certain third parties

---

[1] The parties dispute whether these transactions constitute separate contracts or simply an addition to the Agreement itself. The parties refer to them collectively as the "Coralville Upgrades Contract." For convenience, the court refers to them together as the "Change Orders."

[2] The Coralville Hotel was insured, and an insurance payment of $1,277,600 was paid to Heartland for the flooding loss that the Coralville Hotel incurred.

[3] An estoppel certificate is a "signed statement by a party (such as a tenant or a (continued...)

because a lender had requested them. Heartland initially resisted the request, asserting that it was not required by the Agreement to obtain the certificates. Eventually, however, Heartland began to pursue the estoppel certificates. Heartland had mixed success obtaining the certificates. It obtained certificates for hotels in Waterloo and Ankeny, Iowa, but was apparently unsuccessful in obtaining certificates from at least three other hotels.

Sometime in September of 2008, Martindale discovered that the registration for Heartland's trademarks listed the owner as "Heartland Inns of America (Iowa corporation)," rather than Heartland Inns of America, LLC. Duncliffe asked Heartland to clarify the ownership of the trademarks so that they could be assigned to Martindale. Heartland hired counsel in Washington D.C. to apply to the United States Patent and Trademark Office ("USPTO") to correct the registration.

Heartland continued to allow Martindale and its representatives, including potential lenders, to visit and inspect the hotels throughout the spring, summer and early fall of 2008. However, in October of 2008, William Hollenbeck ("Hollenbeck"), Martindale's "eyes and ears on the ground" in Iowa, was denied access to inspect the Coralville Hotel for the first time. Defendant's Appendix ("Def. App'x") (docket nos. 45-4-5), at 114-15.

### F. The Amendment

On August 19, 2008, the parties executed an "Amendment to Purchase and Sale Agreement" ("Amendment"). The Amendment states that "[c]ertain matters have arisen which require that the Closing be delayed." Pl. App'x at 46. The Amendment modified the Agreement in three ways. First, the closing date was extended from August 27, 2008 to September 30, 2008. Second, in consideration of this extension, Martindale agreed to release the $500,000 deposit in escrow to Heartland. If the transaction closed, the

---

[3](...continued)
mortgagee) certifying for another's benefit that certain facts are correct . . . A party's delivery of this statement estops that party from later claiming a different set of facts." *Black's Law Dictionary* 495 (5th ed. 1979).

$500,000 deposit would be applied to the purchase price. If the closing did not occur, the $500,000 deposit was to be "deemed non-refundable" unless the closing failed due to Heartland's default or Heartland was otherwise unable to close pursuant to the Agreement. *Id.* Third, the Amendment gave Martindale the option to extend the closing by an additional 30 days if it made a request in writing by September 25, 2008 and deposited $1 million into escrow. If Martindale exercised this option, the closing would have been postponed until October 30, 2008. This additional deposit would have been credited toward the purchase price at closing.

Section 6 of the Amendment, entitled "NO OTHER CHANGES," provides: "[e]xcept as specifically amended by this Amendment, the Purchase and Sale Agreement is ratified and confirmed in all respects." *Id.* at 47.

### G. Parties Dispute Pre-Closing Requirements

On September 25, 2008, five days before the closing date set forth in the Amendment, Lynn Roland ("Roland"), counsel for Martindale, wrote to Heartland's counsel, Braun. Roland's letter stated that "the failure of [Heartland] to complete the flood damage repairs to the hotel properties makes it impossible for [Heartland] to be prepared to close on September 30, 2008." *Id.* at 64. The letter stated that, "once the work is completed, [Martindale] and its lenders are entitled to a reasonable period of time to inspect and evaluate the work. Only after that can the closing occur." *Id.*

The letter also identified several other "pre-closing requirements" that Martindale believed Heartland had not yet satisfied. *Id.* These included, but were not limited to, "(i) establishing title to [Heartland's] trademarks, (ii) obtaining the required estoppel certificates and consents, and (iii) finalizing the Dubuque South variance." *Id.*

The letter stated that a postponement of the closing was necessary as a "result of [Heartland's] failures." *Id.* Roland stated that Martindale "intends to close the transaction as soon as reasonably possible and does not believe it is prudent for either seller or

purchaser to allow this dispute over the closing to continue." *Id.* at 65. Martindale set forth this proposed resolution:

> 1. [Martindale] will make an additional deposit to [Heartland] of $250,000, which deposit will not be held in escrow and will be credited against the purchase price at closing;
>
> 2. The closing will be adjourned to October 30, 2008; and
>
> 3. [Martindale] will be entitled to an additional adjournment to December 3, 2008.

*Id.*

On September 26, 2008, Braun responded to the letter. Braun stated that he had reviewed Roland's letter with Heartland and he "disagree[d] with [Martindale's] conclusions, and believe[d] that the transaction should close on September 30, 2008, as scheduled." *Id.* at 241.

Braun stated that Heartland had three alternatives it would consider. First, Heartland would allow Martindale to make the additional $1 million deposit called for by the Amendment by 5:00 p.m. on September 26, 2008, which would extend the closing for 30 days.[4] Second, if Martindale was unwilling to extend the closing by making the additional deposit, Heartland "would consider an extension of the closing if the following conditions [were] met before the close of business . . . on September 26, 2008:"

> 1. [Heartland] has received a copy of a firm commitment from a lender of [Martindale's] choice with a clear listing of all conditions which must be performed by [Martindale] prior to closing.

---

[4] As discussed in Section V.F., *supra*, the Amendment provided that this 30 day extension was allowed only if Martindale gave Heartland notice that it desired to exercise the option by September 25, 2008. Braun's letter apparently misstated the date or indicated a willingness on Heartland's part to extend this deadline by one day.

2. In addition, evidence would need to be provided acceptable to [Heartland] that [Martindale has] immediate good funds available to meet any requirements of the commitment letter for down payment or the payment of expenses other than those which would be paid by the extension of credit based upon the commitment letter.

*Id.* at 241-42. Braun stated that Heartland would review the commitment and decide "in its sole discretion" whether Martindale could reasonably meet the conditions. *Id.* at 242. Further, Heartland would consider an extension of up to 30 days if the commitment was accompanied with a deposit acceptable to Heartland. Braun rejected as unacceptable the $250,000 deposit proposed in Roland's September 25, 2008 letter. Third, Braun stated that, if Martindale did not accept either of these options, Heartland would "consider [Martindale's] actions to be an anticipatory breach of the [Agreement]." *Id.* Martindale did not agree to any of the alternatives that Heartland proposed.

### H. Parties Fail to Close

The September 30, 2008 closing date passed without a closing or other resolution. However, the parties continued to communicate through early October, apparently in an effort to complete the transaction.

### I. Notice of Default

On October 14, 2008, Heartland's President, Minard, wrote to Roland and Martindale's Vice President, Lawrence Lopater ("Lopater"). Minard stated that Heartland considered Martindale to be in "default" under the Agreement "for the failure of [Martindale] to close the transaction . . . on or before September 30, 2008." Def. App'x at 100. The letter stated the Agreement would be terminated immediately unless:

(i) a firm commitment letter from a lender of [Martindale's] choice has been obtained which will allow closing on or before December 2, 2008; (ii) a copy of said commitment is forwarded to [Heartland] on or before Four o'clock (4:00) P.M. EDT on Wednesday, October 15, 2008; and (iii) the

> proposed extension agreement previously forwarded to you
> . . . is signed and returned to [Heartland] along with said
> commitment . . . .

*Id.*

Minard attached a proposed "Second Amendment to Purchase and Sale Agreement" ("Proposal") to his letter. The Proposal called for an extension of the closing date until October 30, 2008, and gave Martindale the option of further extending it until December 2, 2008 by giving 10 days written notice. The proposal called for a non-refundable deposit of $250,000 in consideration for the extension. Martindale never agreed to the Proposal.

### J. Heartland Revoke's Martindale's Inspection Privileges

On October 16, 2008, Heartland's broker, Barry Swanson ("Swanson"), e-mailed Martindale's representatives. In his e-mail, Swanson stated that Martindale was not to visit any of Heartland's hotels without prior written approval from Heartland. That same date, Heartland's counsel, Michael Young ("Young"), wrote to Lopater and Roland. Young stated that "there is no extension of the [Agreement], whether by agreement of the parties, operation of law, or otherwise. [The Agreement] has been terminated following [Martindale's] default." Def. App'x at 89.

## VI. ANALYSIS

Heartland asks the court to dismiss Martindale's Amended Complaint and to grant its motion for summary judgment on its breach of contract counterclaims. Martindale asks the court to dismiss Heartland's tortious interference counterclaim. In its Motion to Strike, Martindale asks the court to strike certain exhibits that Heartland submitted with its Surreply in connection with its tortious interference counterclaim.

First, the court shall address the Heartland Motion. Second, the court shall address the Martindale Motion. Third, the court will address Martindale's Motion to Strike.

### A. Heartland Motion

Heartland contends that it is entitled to summary judgment on its breach of contract

counterclaims. Heartland also asks the court to dismiss Martindale's Amended Complaint because there are no genuine issues of material fact with respect to the parties' breach of contract claims. Martindale resists.

### 1. *Heartland's argument*

Heartland argues that it is entitled to summary judgment on one of its breach of contract counterclaims because Martindale breached the Agreement by failing to close by September 30, 2008. The plaintiff in a breach of contract action must prove the following elements:

> (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998). "A party breaches a contract when, without legal excuse, it fails to perform any promise which forms a whole or a part of the contract." *Id.*

The Agreement, as modified by the Amendment, set the closing for September 30, 2008. Section 2.1.2 of the Agreement obligated Martindale to tender $44,500,000 at closing. It is undisputed that Martindale did not tender the balance of the purchase price on or before September 30, 2008. Thus, Heartland's breach of contract counterclaim with respect to the Agreement turns on whether Martindale had a "legal excuse" that discharged it from its contractual duty to tender on September 30, 2008.

### 2. *Martindale's defenses*

Martindale argues that summary judgment is not warranted because a number of factors excused it from closing on September 30, 2008. First, Martindale alleges that Heartland failed to repair the Coralville Hotel and allow it to inspect the Coralville Hotel prior to closing. Second, Martindale alleges that Heartland failed to obtain estoppel certificates for certain properties that were subject to the Agreement. Third, Martindale

alleges that Heartland failed to secure a zoning variance. Finally, Martindale alleges that Heartland was unable to assign the rights to its trademarks before closing. The court shall address these purported excuses, in turn.

### a. Coralville Hotel repairs

Martindale argues that its failure to tender by September 30, 2008 was excused due to Heartland's failure to complete the Coralville Hotel renovations and provide Martindale with a "reasonable opportunity to inspect" the Coralville Hotel prior to closing. Heartland argues that it was not contractually required to complete the repairs prior to closing. Heartland also argues that Martindale forfeited its right to a continuing inspection of the Coralville Hotel when it allowed the Due Diligence Period to expire on June 28, 2008. Heartland contends that Martindale had no further right to inspect the Coralville Hotel after June 28, 2008 and that Martindale was required by Section 4.1 of the Agreement to accept the hotels on the closing date "as is."

The court acknowledges that the Agreement does not impose an express duty on Heartland to repair the Coralville Hotel. Section 19.1 of the Agreement also provides that the Agreement "embod[ies] the entire agreement existing between the parties" and that the "Agreement may not be modified . . . except in a writing signed by all parties." Def. App'x at 35. However, Martindale argues that the explicit terms of the Agreement do not control the dispute. Martindale argues that the parties' course of dealing and the Amendment modified the Agreement.

"Whether a contract has been modified by the parties is ordinarily a question of fact." *Tindell v. Apple Lines, Inc.*, 478 N.W.2d 428, 430 (Iowa Ct. App. 1991). An executory contract, that is, one that has been partially but not completely performed by either party, "may be effectively modified by one party with the consent of the other provided it does not violate the law or public policy." *Davenport Osteopathic Hosp. Ass'n of Davenport, Iowa v. Hosp. Serv., Inc., of Iowa*, 154 N.W.2d 153, 157 (Iowa 1967).

"[T]he requisite consent may be either express or implied from acts and conduct." *Id.* Further, "strict compliance with the terms of a contract on the part of one party may be waived by the other . . . ." *Capital City Brick & Pipe Co. v. City of Des Moines*, 127 N.W. 66, 70 (Iowa 1910). Parties may waive contract provisions through their course of dealing. *See, e.g.*, *Dunn v. Gen. Equities of Iowa, Ltd.*, 319 N.W.2d 515, 516-17 (Iowa 1982) (reiterating that one way to prove waiver of contract provisions is by evidence of a general course of dealing between the parties and noting that such rule is applicable to contract rights generally). This is generally true even where the contract provides that modifications must be in writing or contains an "anti-waiver" clause. *See Whalen v. Connelly*, 545 N.W.2d 284, 291 (Iowa 1996) ("[A] provision in a written contract that it can be modified or rescinded *only* in writing is ineffective."); *see also* 17A Am. Jur. 2d Contracts § 514 ("The rule followed by the courts generally, with some authority to the contrary, is that unless a contract is required by law to be in writing, the contract can be modified orally, even though it provides that it can be modified only in writing"); 13 Williston on Contracts § 39:36 (4th ed.) ("The general view is that a party to a written contract can waive a provision of that contract by conduct expressly or surrounding performance, despite the existence of a so-called anti-waiver or 'failure to enforce' clause in the contract").

The court finds that there is a genuine issue of material fact as to whether the parties' extended the Due Diligence Period through their course of dealing. Martindale argues that the flood in June of 2008 nullified the original timetable to complete due diligence and that the parties' course of dealing extended the Due Diligence Period indefinitely. Lopater, Martindale's Vice President, testified that the parties executed the Amendment because the repairs were taking longer than expected and because Martindale's lenders still needed to inspect the properties. Hollenbeck, Martindale's "eyes and ears on the ground" in Iowa, testified that Heartland continued to allow him to access the

Coralville Hotel throughout the summer and fall of 2008—more than three months after the original Due Diligence Period would have expired. The parties agree that Heartland did not deny Hollenbeck access to any of the properties until early to mid-October 2008, approximately two weeks after the closing date and more than three months after the Due Diligence Period allegedly expired.

Heartland agrees that it allowed Martindale representatives complete access to the Coralville Hotel until some time in October of 2008. However, Heartland argues that it was not required to do so because the Due Diligence Period had expired on June 28, 2008. The court agrees that Heartland appears to be on solid ground based on the language of the Agreement. However, it is the law in Iowa that contracts can be modified and provisions waived by a course of dealing between the parties. Similarly, consent to a modification can be either express or implied. *Davenport Osteopathic*, 154 N.W.2d at 157. The evidence establishes a genuine issue of material fact as to whether Heartland impliedly consented to a modification of the contract by allowing Martindale continued access and inspection rights to the hotel properties. *See, e.g.*, *Crown Colony, Inc. v. Iowa Rural Water Ass'n, Inc.*, No. 00-2039, 2002 WL 531512, at *2 (Iowa Ct. App. Mar. 27, 2002) (seller waived right to timely termination notice where it gave buyer numerous extensions of contractual deadlines); *Cf. Davenport Osteopathic*, 154 N.W.2d at 158 (hospital did not assent to modification of agreement by its "mere acceptance . . . of a lesser amount than that prescribed in the original contract . . . ."). The parties agree that Martindale was allowed complete access to the hotels until October. Thus, Heartland allowed Martindale to inspect and investigate the Coralville Hotel for at least three months longer than called for by the Agreement. The parties simply dispute what was intended by this course of conduct and whether it modified the Agreement. Whether the parties' Agreement was modified by their course of dealing is a question of fact, which is a genuine issue for trial.

Martindale also asserts that the terms of the Amendment show the parties

understood that the Due Diligence Period had not expired on June 28, 2008. Section 2 of the Amendment provides that the $500,000 deposit released to Heartland would be credited to the purchase price at closing. If closing did not occur, however, Section 2 provides the deposit "shall be deemed non-refundable to the extent provided in Section 2.4 of the [Agreement]." Pl. App'x at 46. Section 2.4 of the Agreement, in turn, provides that the deposit "shall become non-refundable *at the expiration of the Due Diligence Period . . . .* " *Id.* at 9 (emphasis added). Martindale argues that, because the Amendment was executed in August of 2008, it "plainly reflects Heartland's own understanding that the Due Diligence Period had not expired on June 28, 2008 . . . ." Pl. Brief (docket no. 53-2) at 10. Heartland denies that the parties had any such understanding or that the Amendment reflected an extension of the Due Diligence Period.

The court finds that there is a genuine issue of material fact as to whether the Amendment reflects an agreement between the parties that the Due Diligence Period remained open after June 28, 2008. Martindale's urged interpretation of the Amendment is strained, and one would expect sophisticated parties in a complex transaction to set out such a significant change to the contract in a less-attenuated fashion. However, the Amendment clearly references Section 2.4 of the Agreement, which provides the deposit will become non-refundable "at the expiration of the Due Diligence Period." Pl. App'x at 46. Thus, the Amendment, in its most literal sense, refers to the Due Diligence Period as if it were still open. It is possible that the parties intended the reference to Section 2.4 to be limited to the exceptions regarding casualty, condemnation and Heartland's potential default. However, the Amendment contains nothing else to elaborate on the point, and the vague reference in the Amendment to "certain matters" that require the closing to be delayed only sharpens the dispute as to why the Amendment was necessary and for whose

benefit it was executed.[5]

### b. *Estoppel certificates*

Martindale argues that there is a genuine factual dispute over whether Heartland breached the Agreement by failing to obtain certain estoppel certificates by the closing date. Heartland continues to dispute whether the Agreement required it to obtain the estoppel certificates. However, the estoppel certificates arguably fall within the ambit of Section 10.1.18 of the Agreement, as documents necessary to "consummate the transaction." *See* Pl. App'x at 20 (requiring Heartland to deliver "[s]uch other instruments and documents as may be reasonably required to consummate the transaction . . . .").

The court finds that there is a genuine issue of material fact as to whether the estoppel certificates were reasonably required to consummate the transaction. "Determinations of reasonableness are generally questions of fact." *Grunwald v. Quad City Quality Serv., Inc.*, No. 01-1353 2003 WL 182957, *2 (Iowa Ct. App. Jan. 29, 2003) (citing *St. Ansgar Mills, Inc. v. Streit*, 613 N.W.2d 289, 295 (Iowa 2000)). The timing of Martindale's request and the necessity of the estoppel certificates to the transaction, among other factors, are relevant to determine whether the estoppel certificates were "reasonably required" within the language of Section 10.1.18.

Further, the court finds that there is a genuine issue of material fact as to whether Martindale excused Heartland's alleged duty to obtain the estoppel certificates. Heartland cites to correspondence between the parties' lawyers in which Young, Heartland's counsel, informs Duncliffe, Martindale's counsel, of Heartland's difficulty in obtaining certain estoppel certificates. Duncliffe responded that a certain estoppel certificate need not be

---

[5] Because the court finds that a genuine issue exists over whether the parties extended the Due Diligence Period, the court need not address whether the Coralville Hotel repairs were substantially completed by closing. Heartland's obligation, if any, to complete the repairs to the Coralville Hotel turns on whether the Due Diligence Period expired and therefore cannot be resolved at this point.

prioritized because she wanted to be able to tell the lender that Martindale "made a good effort." Def. App'x at 64. In another exchange, Duncliffe told Young "[w]e'll take whatever we can get" with respect to estoppel certificates. *Id.* at 66. The court finds that this correspondence creates a genuine issue of material fact as to whether the estoppel certificates were reasonably required and also whether Martindale excused Heartland from obtaining the estoppel certificates.

### c. *Zoning variance*

Martindale argues that there is a genuine issue of material fact as to whether Heartland breached the Agreement by failing to obtain a zoning variance for the Dubuque Hotel. Heartland contends that it was not required to obtain the variance because Martindale failed to timely raise a title objection with respect to that property. That is, Martindale failed to notify Heartland by June 28, 2008, the conclusion of the Due Diligence Period, of the setback encroachment. In any event, Heartland asserts that it obtained the variance on September 25, 2008.

Section 5.5 of the Agreement requires Martindale to object to liens or encumbrances on the property by the end of the Due Diligence Period or five business days after Martindale learns of the encumbrance, whichever is later. The parties agree that Martindale first learned of the encroachment on May 30, 2008 but that it did not notify Heartland of it until August 21, 2008. Martindale's objection clearly was not made within the original Due Diligence Period.

However, in light of the court's finding that a genuine issue of material fact exists with regard to whether the Due Diligence Period had been extended, the timeliness of Martindale's objection cannot be resolved on summary judgment. If the parties extended the Due Diligence period indefinitely, Martindale's objection to the encroachment would be timely under the Agreement. If, on the other hand, the Due Diligence Period expired on June 28, 2008, the objection was untimely, and Heartland would have no contractual

duty to clear the encumbrance.

### d. Trademark rights

Martindale also argues that Heartland breached the Agreement because it was unable to assign rights to Heartland's trademarks by the closing date. Heartland does not dispute that it had an obligation to assign its trademark rights under the Agreement. Rather, Heartland argues that the mistake on the registration with the USPTO was a typographical error and that its "ability to assign the mark to Martindale has never been in doubt." Def. Brief (docket no. 45-2) at 14.

The court finds that there is a genuine issue of material fact with regard to Heartland's ability to assign its trademarks by closing. Heartland argues that Martindale never "claim[ed] that the trademark issue caused Martindale to withdraw from the transaction" prior to the scheduled closing. Def. Brief at 14. However, Martindale's counsel specifically raised this issue on September 25, 2008 as a "pre-closing requirement" that it believed Heartland had not yet satisfied. Pl. App'x at 64. The parties have put forth no evidence which shows that the trademark registration was corrected prior to the September 30, 2008 closing. Thus, the court finds that summary judgment is not appropriate on this issue.

### e. Summary

In conclusion, the court finds that there are genuine issues of material fact with respect to Heartland's and Martindale's respective claims for breach of the Agreement. The court notes that the contract clearly sets out the parties' obligations with respect to many of the issues they now dispute. Specifically, the Agreement provides for a single 45 day Due Diligence Period in which Martindale could inspect and investigate the hotels. The Agreement was not contingent on financing, and at the termination of the Due Diligence Period, the Agreement is clear that Martindale was obligated to accept the hotels "as is" on the closing date. The Agreement is also clear that modifications could be made

only in writing and that the parties would not waive their rights under the Agreement by failing to enforce those rights.

However, the parties' course of dealing over the summer and early fall of 2008 creates a genuine issue of material fact as to whether they intended to modify the Agreement. It is unclear whether Martindale continued to visit the Coralville Hotel as part of its "due diligence" or whether Heartland simply allowed Martindale to do so in order to see how the repairs were progressing. While it is a close call, the court finds that summary judgment is not appropriate on the parties' claims for breach of the Agreement.

### 3.     *Breach of Change Orders*

Heartland argues that it is entitled to summary judgment on its breach of contract counterclaim with respect to the Change Orders. Heartland contends that it completed $122,601 of repairs and upgrades called for by the Change Orders. Martindale concedes that it has not paid Heartland for these changes. Martindale argues, however, that the Change Orders were not stand-alone contracts but instead part of the original Agreement and that "Heartland's ability to recover for the [Change Orders] depends upon whether Heartland has complied with all of its own obligations under the Agreement and the Amendment." Pl. Brief at 24.

Martindale correctly notes that, "[w]hen two instruments are entered into between the same parties concerning the same subject matter, whether made simultaneously or on different days, they may, under some circumstances, be regarded as one contract and construed together." 17A Am. Jur. 2d Contracts § 379. However, this principle is generally inapplicable when there is evidence indicating a contrary intent or where the two instruments are incompatible. *See Bergfeld v. Farm Credit Banks of Omaha*, 439 N.W.2d 217, 219 (Iowa App. 1989); 17A Am. Jur. 2d Contracts § 379.

Heartland offers evidence that demonstrates the Change Orders were not intended to be part of the Agreement. Lopater, Martindale's Vice President, testified that the

Change Order was "*in addition to* the $45 million purchase contract." Def. App'x at 110 (emphasis added). Hollenbeck, Martindale's "eyes and ears on the ground" in Iowa, testified that the Change Order #2 was "above and beyond the insurance repair, because *[it] was a change*." Def. App'x at 116 (emphasis added).

However, Martindale maintains that the parties intended the Change Orders to be part of the original Agreement. Martindale argues that the very name "Change Order" implies the parties were "changing" the work Heartland was to perform under the Agreement. Martindale also contends that the complete absence of traditional contract terms in the Change Orders illustrates that the parties intended them to be rolled into the Agreement. Finally, Hollenbeck testified that the manager of the Coralville Hotel actually proposed the upgrades and that Hollenbeck agreed to include the additional proposals.

The court finds that there is a genuine issue of material fact with regard to whether the parties intended the Change Orders to be separate contracts or simply part of the Agreement. In light of this finding, the court need not address Heartland's contention that it substantially completed the work called for by the Change Orders by closing. If the upgrades were intended to be part of the Agreement, Heartland's recovery would be contingent on whether it performed its duties under the Agreement.

### 4. *Summary*

The court finds that there are genuine issues of material fact regarding Heartland's breach of contract claims. Accordingly, the court shall deny the Heartland Motion.

## B. *Martindale Motion*

Heartland alleges that the First Complaint, which sought a declaratory judgment that the Agreement remained in force, prevented Heartland from entering into a contractual relationship with third parties for the sale of its hotels. Heartland notified Martindale that third parties had offered to buy the hotels but that the instant action inhibited Heartland's ability to enter into any other contract. Heartland alleges that, despite giving this notice

to Martindale, Martindale did not withdraw its original complaint until May 21, 2009, at which time "Heartland was, at last, free to market the hotels to third parties and enter into negotiations with prospective purchasers." Def. Resistance (docket 52-1) at 10. Heartland further alleges that Martindale had made the decision months earlier not to purchase the hotels.

Martindale argues that the court should grant the Martindale Motion and dismiss Heartland's tortious interference counterclaim because (1) Heartland cannot show the First Complaint was "objectively baseless" and "subjectively motivated by bad faith;" and (2) Heartland fails to show that a third party declined to purchase the hotels because of Martindale's lawsuit. Heartland resists.

### 1. Noerr-Pennington *immunity*

Martindale argues that the court should dismiss the tortious interference claim based on the *Noerr-Pennington* doctrine. This doctrine "generally immunizes the act of filing a lawsuit from tort liability." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1080 n.4 (8th Cir. 1999) (citing *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965)). Although it originated in the antitrust context, Iowa and many other jurisdictions have since applied the *Noerr-Pennington* doctrine to other types of actions, including tortious interference claims. *Bond v. Cedar Rapids Television Co.*, 518 N.W.2d 352, 356 (Iowa 1994) (noting expansion of doctrine by courts to tortious interference claims and applying *Noerr-Pennington* to tortious interference with contract suit). The burden is on Heartland to "raise and negate *Noerr* immunity." *Id.* at 355.

Rather than challenge the doctrine's applicability, Heartland argues that the First Complaint falls within the *Noerr-Pennington* "sham" exception, and therefore Martindale is not immune from liability. Under the sham exception, "[i]mmunity is withheld from those situations where the petitioning activity[] 'extensively directed towards influencing

government action[] is a mere sham to cover . . . an attempt to interfere directly with the business relationships of the competitor.'" *Id.* at 356 (quoting *Noerr*, 356 U.S. at 144). A lawsuit is considered a sham if two conditions are met. First, "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id.* (quoting *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993)). Second, if the action is found to be objectively baseless, the court "should look to the subjective intent and ask 'whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor . . . through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon.'" *Id.*

### a.    First Complaint was not "objectively baseless"

The court finds that the First Complaint was not objectively baseless. The First Complaint alleged that Heartland failed to complete several pre-closing requirements and sought a declaratory judgment that Heartland did not have a contractual right to terminate the Agreement. Heartland fails to point to any evidence that the First Complaint was objectively baseless. The First Complaint set forth a good faith dispute as to whether Heartland could effectively terminate the Agreement and whether Heartland performed its duties under the Agreement.[6] The parties' continuing dispute as to who breached the Agreement belies any notion that the First Complaint was objectively baseless.

In arguing that Martindale's lawsuit was a "sham," Heartland essentially addresses the merits of the parties' breach of contract dispute. However, a distinction must be drawn for purposes of the *Noerr-Pennington* doctrine between ultimate success on the merits and whether a lawsuit was objectively baseless. *See, e.g., IGEN Int'l, Inc. v. Roche*

---

[6] The court notes that the Agreement specifically provides that one of Martindale's remedies if it believed Heartland was in default was to "seek an action for specific performance under [the] Agreement[.]" Pl. App'x at 34.

*Diagnostics GMBH*, 335 F.3d 303, 312 (4th Cir. 2003) (unfair competition action entitled to immunity because "[t]he mere existence of a possible defense to the . . . claim does not render the lawsuit a sham."); *White v. Lee*, 227 F.3d 1214, 1232 (9th Cir. 2000) ("The fact that a litigant loses his case does not show that his lawsuit was objectively baseless for purposes of *Noerr-Pennington* immunity."). To negate the immunity provided by the doctrine, Heartland has the burden to show that no reasonable litigant in Martindale's position could "realistically expect success on the merits." *Bond*, 518 N.W.2d at 356. The fact that Martindale may be wrong on the merits underlying the First Complaint does not make its lawsuit objectively baseless for purposes of *Noer-Pennington* immunity. Because Martindale's First Complaint was not objectively baseless, the sham exception to *Noerr-Pennington* immunity is inapplicable. Martindale's actions in filing the First Complaint cannot be the basis of tort liability. Accordingly, the court shall grant the Martindale Motion and dismiss Heartland's tortious interference claim.

### b.    *Martindale's subjective intent*

In light of the court's finding that Martindale's First Complaint was not objectively baseless, the court need not consider Martindale's subjective intent in bringing the suit. The court notes, however, that even if it found the First Complaint to be objectively baseless, Heartland has put forth no evidence to suggest that Martindale's lawsuit was merely a concealed "attempt to interfere directly with the business relationships" of Heartland. *Bond*, 518 N.W.2d at 356. Accordingly, the court would dismiss Heartland's tortious interference claim on that basis.

### 2.    *Merits of tortious interference claim*

In addition to asserting *Noerr-Pennington* immunity, Martindale argues that Heartland's tortious interference counterclaim should be dismissed because Heartland has not produced any evidence that someone declined to purchase the hotels as a result of Martindale's lawsuit. "Liability under this theory is imposed when a person intentionally

and improperly interferes with another's prospective contractual relationships with the sole or primary purpose to injure or destroy the plaintiff." *Fin. Mktg. Serv., Inc. v. Hawkeye Bank & Trust of Des Moines*, 588 N.W.2d 450, 459 (Iowa 1999) (citing *Willey v. Riley*, 541 N.W.2d 521, 526-27 (Iowa 1995)). As part of its tortious interference claim, Heartland must prove that "[Martindale's] interference caused the [prospective] relationship to fail to materialize." *Blumenthal Inv. Trusts v. City of West Des Moines*, 636 N.W.2d 255, 269 (Iowa 2001). Martindale contends that its lawsuit did not cause Heartland to lose any prospective business relationships.

Heartland concedes that no prospective purchaser was dissuaded from purchasing the hotels because of the First Complaint. Nonetheless, Heartland argues that this is not fatal to its tortious interference claim because it does not allege that Martindale's suit prevented a *third party* from purchasing the hotels. Rather, Heartland contends that the lawsuit precluded *Heartland itself* from contracting to sell the hotels due to title and warranty concerns caused by Martindale's pending suit. Heartland is correct that tortious interference is not limited to those situations where a third party is inhibited from entering into the prospective relationship. It is sufficient that the claimant itself be inhibited from doing so. *Nesler v. Fisher and Co., Inc.*, 452 N.W.2d 191, 195 (Iowa 1990) (citing Restatement (Second) of Torts § 766B (1979)).

However, Heartland fails to put forth evidence that the First Complaint prevented it from entering into a contract to sell the hotels. The evidence shows that Heartland rejected subsequent offers because it was either unhappy with their terms or was simply not interested. Accordingly, the court shall grant the Martindale Motion and dismiss Heartland's tortious interference counterclaim.

### 3. Summary

The court finds that there is no genuine issue of material fact with regard to Heartland's tortious interference counterclaim. Accordingly, the court shall grant the

Martindale Motion and dismiss Heartland's counterclaim for tortious interference with prospective business relations.

### C.  *Martindale's Motion to Strike*

In its Motion to Strike, Martindale seeks to strike certain exhibits that pertain to Heartland's tortious interference claim and that Heartland submitted with its Surreply (docket no. 58-1).  Because the court deems it appropriate to grant the Martindale Motion, the court shall deny as moot Martindale's Motion to Strike.  In arriving at its conclusion with respect to the merits of the tortious interference claim, the court did not rely on any exhibits at issue in the Motion to Strike.

## VII.  CONCLUSION

In light of the foregoing, **IT IS HEREBY ORDERED**:

(1)     The Heartland Motion for Summary Judgment (docket no. 45) is **DENIED**;

(2)     The Martindale Motion for Partial Summary Judgment (docket no. 46) is **GRANTED**;

(3)     Martindale's Motion to Strike (docket no. 60) is **DENIED AS MOOT**.

**DATED** this 7th day of October, 2009.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA